| | | |
|---|---|---|
| **KATHERINE LOUISE HARRIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:14-00851** |
| **v.** | ) | **Judge Campbell/Brown** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **ACTING COMMISSIONER** | ) | |
| **OF SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**To: The Honorable Todd J. Campbell, United States District Judge.**

### REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration ("the SSA"), through its Commissioner ("the Commissioner"), denying plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 416(i) and 423(d). For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 13) be **DENIED** and the Commissioner's decision **AFFIRMED**.

### I. PROCEDURAL HISTORY

Plaintiff filed for DIB on November 13, 2009. (Doc. 11, pp. 66-67)[1] She claimed a disability onset date of April 21, 2009. (Doc. 11, pp. 36-37, 173, 188)

Plaintiff claimed that she was unable to work because of neck and back pain, degenerative disc disease, chronic bronchitis with chronic obstructive pulmonary disease (COPD) and breathing

---

[1] References to page numbers in the Administrative Record (Doc. 11) are to the numbers that appear in **bold** in the lower right corner of each page.

problems, pain from bone spurs, peripheral vascular disease, right leg claudication,[2] heart disease, and depression. (Doc. 11, pp. 71, 82, 192) Plaintiff's application for benefits was denied on initial review and upon reconsideration. (Doc. 11, pp. 66-71, 77-82)

Plaintiff requested a hearing before an administrative law judge (ALJ). (Doc. 11, pp. 84-85) A hearing was held on September 18, 2012 in Nashville before ALJ Scott Schimer. (Doc. 11, pp. 33-65) Vocational expert (VE) Charles Wheeler testified at the hearing. (Doc. 11, pp. 56-63) Plaintiff was represented by counsel at the hearing. (Doc. 11, p. 33)

The ALJ entered an unfavorable decision on October 5, 2012. (Doc. 11, pp. 12-32) Plaintiff filed a request with the Appeals Council to review the ALJ's decision. (Doc. 11, pp. 7-11) The Appeals Council denied plaintiff's request on January 22, 2014, whereupon the ALJ's decision became the final decision of the Commissioner. (Doc. 11, pp. 1-6)

Plaintiff, through counsel, brought this action on March 26, 2014. (Doc. 1) Plaintiff filed a motion for judgment on the administrative record on August 18, 2014 (Doc. 13), the Commissioner responded on September 17, 2014 (Doc. 14), and plaintiff replied on September 29, 2014 (Doc. 15). This matter is now properly before the court.

## II. REVIEW OF THE RECORD[3]

### A. Medical Evidence

Plaintiff was treated by Affiliated Neurologists, PLC, from June 23, 2006 to May 15, 2007 for neck and right shoulder pain (Doc. 11, pp. 300-20) resulting from an on-the-job injury that occurred June 23, 2006 (Doc. 11, pp. 313, 317). On August 29, 2006, Dr. James Anderson, M.D., reported the following results from a MRI: "multilevel degenerative changes with lateral recess or

---

[2] Claudication – "limping or lameness." *Dorland's Illustrated Medical Dictionary* 369 (32 ed. 2012).

[3] Review of the record has been tailored to plaintiff's arguments.

neuroforaminal[4] narrowing . . . more prominent on the right side as compared to the left . . . [but] . . . no clear nerve root impingement present." (Doc. 11, p. 313) Examination also revealed "very mild" limitations in range of motion of the neck, and "some" tenderness of the neck and between the shoulders. (Doc. 11, p. 314) Otherwise the examination was normal, including "adequate fine motor facility," "5/5 strength," and "intact sensation for all modalities." (Doc. 11, p. 314)

Plaintiff was treated at the Howell Allen Clinic from January 25, 2007 to April 21, 2008. (Doc. 11, pp. 321-50) On July 12, 2007, Dr. Vaughan Allen, M.D., noted that plaintiff previously had a myelogram[5] (EMG). (Doc. 11, p. 340) On October 10, 2007, Dr. Allen characterized the EMG as "suggest[ing] she has . . . carpal tunnel." (Doc. 11, p. 337) Plaintiff underwent a second EMG on October 18, 2007 while being treated at the Howell Allen Clinic. (Doc. 11, p. 333) Doctor Michel Spellman, Jr., M.D., noted multiple moderate-to-severe spinal abnormalities in his report. (Doc. 11, pp. 333-36) On January 25, 2008, Dr. Allen performed a cervical laminectomy and foraminotomy.[6] (Doc. 11, p. 330) The operation was successful. (Doc. 11, pp. 329, 327) Doctor Allen released plaintiff back to work on light duty on February 21, 2008, following which he released her to regular duty on April 21, 2008. (Doc. 11, pp. 321-22, 326-27) The ALJ gave significant weight to Dr. Allen's opinion returning plaintiff to full duty. (Doc. 11, p. 25)

Plaintiff was treated at the Medical Center in Franklin from September 25, 2008 to July 26, 2010. (Doc. 11, 404-23) Imaging on September 25, 2008 revealed "[d]egenerative changes of the thoracic spine," but "[n]o active disease." (Doc. 11, p. 407) Plaintiff had a MRI on April 12, 2010.

---

[4] Neuro – "denoting relationship to a nerve or nerves, or to the nervous system." *Dorland's* at p. 1263. Foramen – "a natural opening or passage, especially one into or through a bone." *Dorland's* at p. 729.

[5] Myelogram – "a radiograph of the spinal cord." *Dorland's* at p. 1219.

[6] Laminectomy – "excision of the posterior arch of a vertebra." *Dorland's* at p. 1003. Foraminotomy – "operation . . . for the relief of nerve root compression." *Dorland's* at p. 731. Cervical laminectomy and foraminotomy – surgery on the vertebrae in the neck to relieve nerve root compression.

(Doc. 11, p. 413)  The overall impression was multilevel degenerative disease and facette arthropathy[7] within the lower thoracic and lumbar spine, multiple areas of disk bulging and bony changes resulting in areas of central and bilateral foraminal stenosis, moderate central canal stenosis associated with broad-based disk bulging, moderate sized right paracentral disk protrusion with herniation, but no nerve root impingement confirmed.  (Doc. 11, p. 413)

Doctor Bruce Davis, M.D., a nontreating, examining source, conducted an "all-systems" consultive examination of plaintiff on May 15, 2010.  (Doc. 11, pp. 368-71)  Doctor Davis noted that plaintiff's corrected distance vision was 20/50 in each eye, and 20/50 together.  (Doc. 11, p. 369)  Doctor Davis also reported that plaintiff had "slow but normal neck flexion, extension, lateral flexion, rotation; normal shoulder, elbow, wrist, finger motion/dexterity with good grip 5/5 without atrophy, [or] swelling."  (Doc. 11, p. 369)  Doctor Davis opined that plaintiff was able to sit 1-2 hrs. continuously, 6 hrs. in an 8-hr. workday; stand 1-2 hrs. continuously, 4-6 hrs. in an 8-hr. workday; and lift 20 lbs. frequently and carry 10-20 lbs. frequently.  (Doc. 11, p. 370)  Doctor Davis also determined that plaintiff had limited ability to bend and climb, and be exposed to heights, extreme heat and cold, and irritating inhalants.  (Doc. 11, p. 370)  The ALJ gave significant weight to Dr. Davis' light work assessment.  (Doc. 11, p. 25)

Doctor Christopher Fletcher, M.D., a nonexamining, nontreating source, completed a physical residual functional capacity (RFC) assessment on June 15, 2010.  (Doc. 11, pp. 377-85)  Doctor Fletcher determined that plaintiff was able to lift up to 20 lbs. occasionally, 10 lbs. frequently; stand and/or walk about 6 hrs. in an 8-hr. workday with normal breaks; sit about 6 hrs. in a normal 8-hr. workday with normal breaks; push and/or pull hand and/or foot controls without

---

[7]  Fecette – "a small plane surface . . . as on a bone."  *Dorland's* at pp. 668-69.  Arthropathy – "any joint disease."  *Dorland's* at p. 158.

limitation.  (Doc. 11, p. 378)  Doctor Fletcher determined further that, although plaintiff could never climb ladders, ropes, or scaffolds, she could climb ramps/stairs, balance, stoop, kneel, crouch, and crawl frequently.  (Doc. 11, p. 379)  He also determined that plaintiff had limited ability to reach in all directions, but no limitations in her ability to handle, finger, and feel.  (Doc. 11, p. 380)  Doctor Fletcher also concluded that plaintiff had limited distance visual acuity.  (Doc. 11, p. 380)  Apart from avoiding concentrated exposure to extreme heat and cold, Dr. Fletcher concluded that plaintiff had no other environmental limitations.  (Doc. 11, p. 381)  The ALJ gave significant weight to Dr. Fletcher's light work assessment.  (Doc. 11, p. 25)

Doctor Brannon Mangus, M.D., a nontreating, examining source, performed an "all systems" consultative examination of plaintiff on October 9, 2010.  (Doc. 11, pp. 471-84)  Doctor Mangus noted, *inter alia*, that plaintiff's grip was 40 lbs. in each hand, she lifted 10 lbs. with each hand, she had normal mobility, her grasp and ability to manipulate objects was normal, her back was symmetric, she exhibited no spinal tenderness and no spasms, her strength was 5/5 in all major muscle groups, her range of motion was within normal limits "universally," and there was "no other tenderness, redness, swelling, spasm, joint enlargement or muscle wasting in any joint examined.  (Doc. 11, pp. 474-75)  Doctor Mangus also reported negative Tinel's and Phalen's Signs bilaterally.[8] (Doc. 11, p. 476)  Doctor Mangus tested plaintiff's vision, and reported that her uncorrected vision in her right eye was 20/70 and 20/100 in her left eye, and with corrective lenses, her vision was 20/50 in her right eye and 20/100 in her left.  (Doc. 11, p. 474)  Although Dr. Mangus diagnosed plaintiff with visual acuity deficit, he also noted that plaintiff's "current prescription was obtained in 2000."  (Doc. 11, pp. 474, 476)  The ALJ gave little weight to Dr. Mangus' opinion "that the

---

[8]  Tinel's and Phalen's Signs are both tests used in determining whether one has carpal tunnel syndrome. Http://www.webmd.com/pain-management/carpal-tunnel/physical-exam-for-carpal-tunnel-syndrome.

claimant ha[d] no impairment-related limitations." (Doc. 11, p. 26)

Doctor Frank Pennington, M.D., a nonexamining, nontreating source, completed a second physical RFC assessment on February 8, 2011. (Doc. 11, pp. 485-91) Doctor Pennington determined that plaintiff was never able to climb ladders/ropes/scaffolds, but did not establish any manipulative limitations. (Doc. 11, pp. 379-80) Otherwise, Dr. Pennington's physical RFC assessment was the same as Dr. Fletcher's, above at pp. 4-5. The ALJ gave Dr. Pennington's light work assessment significant weight. (Doc. 11, p. 25)

Plaintiff was seen at Wesley Medical on May 24, 2012. (Doc. 11, pp. 503-06) Dr. Wesley[9] diagnosed her with acute bronchitis. (Doc. 11, p. 505) Doctor Wesley also made the following observations: 1) denies joint swelling or muscular weakness; 2) "no spinal tenderness, scoliosis or kyphosis";[10] 3) no joint or limb tenderness to palpitation; 4) normal range of motion in all extremities; 5) joint stability normal/within normal limits in all joints; 6) no joint crepitation;[11] 7) no pain on motion of any extremity; 8) no edema present in the lower extremities; 9) normal gait; 10) able to stand without difficulty. (Doc. 11, pp. 504-05)

## B. Transcript of the Hearing

Plaintiff testified that she was 59 years old at the time of the hearing. (Doc. 11, p. 44) She worked previously as a housekeeper, a housekeeping supervisor, in a men's mail order store, on an assembly line sorting tapes, and in a phone factory. (Doc. 11, pp. 39-43) She had not worked since being laid off in 2009. (Doc. 11, p. 43)

---

[9] Dr. Wesley is identified as plaintiff's primary care physician as early as September 25, 2008. (Doc. 11, p. 404) The record shows that Dr. Wesley is a treating source under the rules.

[10] Scoliosis – "an appreciable deviation in the normally straight vertical line of the spine." *Dorland's* at p. 1681. Kyphosis – "abnormally increased convexity in the curvature of the thoracic vertebral column as viewed from the side" *Dorland's* at p. 992.

[11] Crepitation – "the noise made by rubbing together of fragments of fractured bone." *Dorland's* at p. 429.

Plaintiff testified that back pain and breathing problems were her biggest impairments. (Doc. 11, p. 44) She rated her back pain as "six to eight" on a "typical day," adding that the pain radiated down her right hip and leg and caused her leg to go numb. (Doc. 11, pp. 44-45) Plaintiff also testified that her neck burned and stung "all the time." (Doc. 11, p. 46)

Plaintiff testified that she could not walk for more than 10 mins. before having to sit down; she could not stand in one spot for more than 5 mins. because of back and sciatic nerve issues; and she could not sit in one position for more than 10 mins. before needing to alternate her position. (Doc. 11, p. 47) Plaintiff testified that she could lift a maximum of 4 lbs., adding that she could not lift a gallon of milk without using both hands. (Doc. 11, p. 47) Plaintiff also testified that she had been diagnosed with carpal tunnel syndrome, that she had trouble grasping, holding, and handling things, but had not sought treatment to correct/relieve the symptoms. (Doc. 11, p. 50)

The VE characterized plaintiff's past work as follows: 1) production assembler, *Dictionary of Occupational Titles* (DOT) 706.687-010; 2) shipping clerk, DOT 222.387-050; 3) head housekeeper, DOT 187.167-046; 4) housekeeper, DOT 321.137-010; 5) elevator operator, DOT 388.663-010; 6) sorter packer, DOT 976.687-018. (Doc. 11, pp. 57-59) The ALJ posed the following hypothetical to the VE:

> [A]ssume a person of the claimant's age, education, and the past work experience . . . . Assume that this . . . individual would be restricted to light exertional level work; frequent balancing, stooping, kneeling, crouching, and crawling; frequently climbing ramps and stairs; no climbing ladders, ropes, and scaffolding; no concentrated exposure to temperature extremes; and no concentrated exposure to dust, fumes, odors, gases, and poor ventilation; a job that involved simple, routine, repetitive tasks and maybe some low-level detailed tasks, but not complex tasks; and any workplace changes would need to be gradual and infrequent.

(Doc. 11, pp. 59-60)

The VE testified that the production assembler, elevator operator, and sorter packer jobs

would be available with the restrictions posed in the hypothetical. (Doc. 11, pp. 60-61) The VE testified that the production assembler and sorter packer jobs still would be available if the hypothetical person were limited to only occasional contact with the general public, coworkers, and supervisors. (Doc. 11, pp. 61-62) The VE eliminated the elevator operator job as performed due to temperature and dust considerations, and opined that the elevator operator job also would be eliminated based on the requirement for frequent contact with coworkers and supervisors. (Doc. 11, pp. 60-61) The VE testified further that both the production assembler and elevator operator jobs would be eliminated if the hypothetical person were limited to standing/walking 4 hrs. in an 8-hr. workday, and if that were the case, the ALJ noted, plaintiff "would . . . GRID under the rules" because of her age. (Doc. 11, p. 62) Finally, the VE testified that his testimony was consistent with the DOT. (Doc. 11, p. 63)

## C. The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if she can show her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process to determine whether an individual is "disabled" within the meaning of the Act. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2014). While the claimant bears the burden of proof at steps one through four, the burden shifts to the Commissioner at step five to identify a significant number of jobs in the economy that accommodate the claimant's RFC and vocational profile. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

The SSA's burden at step five may be met by relying on the *Medical-Vocational Guidelines*,

known in the practice as "the Grids," but only if the claimant is not significantly limited by nonexertional impairment, and then only when "the characteristics of the claimant exactly match the characteristics of one of the rules." *Wright v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003). In cases where "the Grids" do not direct a conclusion as to the claimant's capacity, the SSA must come forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through the testimony of a VE. *See Wright*, 321 F.3d at 616 (citing SSR 83-12, 1983 WL 31253 (SSA)). In determining the claimant's RFC for purpose of the analysis at steps four and five, the SSA is required to consider the combined effect of all the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), (5)(B); 20 C.F.R., 404.1523; 404.1545(a)(2); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 725-26 (6th Cir. 2014).

The ALJ determined that plaintiff had the RFC to perform light work as defined in 20 CFR § 404.1567(b) with postural, manipulative, environmental, performance, and workplace related limitations. (Doc. 11, p. 20) The ALJ also determined that plaintiff was capable of performing past relevant work (PRW) as a production assembler and sorter/packer. (Doc. 11, p. 26)

### III. ANALYSIS

#### A. Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record, and whether the decision was made pursuant to proper legal standards. 42 U.S.C. § 405(g); *Gayheart*, 710 F.3d at 374. Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see Gentry*, 741 F.3d at 722. The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence

also could support a different conclusion. *Gayheart*, 710 F.3d at 374. "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006).

## B. Claims of Error

### 1. Whether the ALJ Erred in Not Finding Plaintiff Limited to Sedentary Work and, Therefore, Disabled Under the *Medical-Vocational Guidelines*

Plaintiff argues the ALJ erred in determining that she is capable of performing "a range of light work except for some additional limitations," because the ALJ "fail[ed] to account for all of the limitations resulting from h[er] severe impairments." (Doc. 13-1, p. 9) More particularly, plaintiff argues that her severe impairments "warrant a limitation to a maximum of sedentary work" and, had the ALJ so determined, she would be disabled under "the Grids." (Doc. 13-1, p. 9)

Plaintiff argues first that the ALJ "failed to address or even acknowledge" Dr. Davis' assessment that she was limited "to sitting or standing only one to two hours continuously and standing only four to six hours total during an eight-hour workday," that she had limited ability to ability to bend, climb or be exposed to extreme heat and cold, and that she was limited to standing 4-6 hrs. during an 8-hr. workday. (Doc. 13-1, pp. 9-10)

As an initial matter, "[t]he ALJ is not required to simply accept the [opinion] of a medical examiner based solely on the claimant's self-reports of symptoms, but instead is tasked with interpreting medical opinions in light of the totality of the evidence." *Griffith v. Comm'r of Soc. Sec.*, 582 Fed.Appx. 555, 564 (6th Cir. 2014)(citing 20 C.F.R. § 416.927(b)); *Bell v. Barnhart*, 148 Fed.Appx. 277, 285 (6th Cir. 2005)(declining to give weight to a doctor's opinion that was only supported by the claimant's reported symptoms). Doctor Davis did not refer to any medical or clinical findings. Therefore, the ALJ was not required to accept his opinion.

10

In any event, the ALJ did acknowledge Dr. Davis' findings with specific reference – in bold below – to most of those limitations that are the focus of this argument:

> Dr. Davis opined that the claimant could frequently lift twenty pounds, frequently carry ten to twenty pounds, **sit for one to two hours continuously and for six hours in an eight-hour workday**, and **stand for one to hours continuously and for four to six hours in an eight-hour workday** . . . . He also opined that she was **limited in her ability to bend, climb, and tolerate exposure to** heights, **extreme temperatures**, and irritating inhalants . . . .

(Doc. 11, p. 22) The record shows that the ALJ also addressed all but two of the limitations at issue in his RFC assessment. Specifically, the ALJ's RFC assessment limits plaintiff to standing/walking and sitting to 6 hrs. in an 8-hr. workday (Doc. 11, p. 20), neither of which limitation exceeds Dr. Davis's limitations of 6 hrs. and 4-6 hrs. respectively (Doc. 11, p. 370). The ALJ's RFC assessment also includes that plaintiff was limited to "no climbing of ladders, ropes, or scaffolds . . . no concentrated exposure to temperature extremes . . . or . . . pulmonary irritants . . . ." (Doc. 11, p. 20), again all consistent with Dr. Davis' assessment (Doc. 11, p. 370). In short, not only did the ALJ acknowledge these limitations, he accepted and adopted them.

The ALJ did not address Dr. Davis' 1-2 hr. continuous sit/stand limitation in his RFC determination. However, breaks every 2 hrs. are normal and assumed in most jobs. *See* SSR 96-9p, 61 Fed.Reg. 34478 (July 12, 1996)(recognizing that an individual receives a morning break, a lunch period, and an afternoon break in approximately 2 hr. intervals). Therefore, even if the ALJ erred in not addressing this limitation in his decision, the 2-hr. break presumption renders such error harmless. *See Rudd v. Comm'r of Soc. Sec.*, 531 Fed.Appx. 719, 730 (6th Cir. 2013)(citing *Rabbers v. Comm'r of Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009)).

The ALJ also did not address Dr. Davis' "bending" limitation. Plaintiff does not object to the characterization of those postural limitations noted, *i.e.*, balancing, stooping, kneeling,

crouching, crawling, and climbing, as "frequent" rather than "occasional." *See* SSR 83-10; 1983 WL 31251 at ** 5-6 (S.S.A.)(defining "occasionally" as meaning "from very little up to one-third of the time" in an 8-hr. workday, and "frequent" as "occurring from one-third to two-thirds of the time" in an 8-hr. workday). Plaintiff argues only that the ALJ did not address Dr. Davis' "bending" limitation.

Nonexertional impairments under the regulations are defined, in relevant part, as "[a]ny impairment which does not directly affect the ability to sit, stand, walk, lift, carry, push, or pull . . . includ[ing] . . . use of the body to climb, balance, stoop, kneel, crouch, crawl . . . ." SSR 83-10, Glossary; 1983 WL 31251 at *6 (S.S.A.). Because the ALJ addressed the nonexertional impairments specified in SSR 83-10, he did not err by not addressing Dr. Davis' "bending" limitation which is not provided for in the definition of "nonexertional impairment," and for which Dr. Davis offered no supporting medical and/or clinical support.

Plaintiff argues next that, if the ALJ had found her unable to stand/walk more than 4 hrs. in an 8 hr. workday, her PRW would be precluded, and she would "Grid" under the rules, *i.e.*, she would be limited to sedentary work and, therefore, disabled because of her age.[12] (Doc. 13-1, p. 10) As previously noted above at p. 8, the VE testified that plaintiff's PRW would be eliminated if she were able to stand/walk only 4 hrs. in an 8-hr. workday. That said, the VE did not testify that plaintiff was able to stand/walk only 4 hrs. in an 8-hr. workday. Such an opinion was not within his purview. His testimony was merely in response to the ALJ's amended hypothetical, an amendment based on the lower end of Dr. Davis' 4-6 hr. stand/walk limitation. Plaintiff asserts that she should be given "the benefit of the doubt" with respect to the range opined by Dr. Davis, *i.e.*, that the ALJ

---

[12] Title 20 C.F.R Pt. 404, Subpt. P, App. 2, § 201.00(d) provides that "[t]he adversity of functional restrictions to sedentary work at advanced age (55 and over) for individuals with no relevant past work or who can no longer perform vocationally relevant past work . . . warrants a finding of disabled . . . ." Plaintiff was a "person of advanced age" at all times relevant to the proceedings before the court. 20 C.F.R. § 404.1563(d).

should have determined that she could stand/walk only 4 hrs. in an 8-hr. workday.  (Doc. 13-1, p.

10)  As established above at pp. 9-10, the benefit of the doubt goes to the Commissioner under the

"substantial evidence standard."  *See Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359,

377 (1998)("The 'substantial evidence' test . . . gives the agency the benefit of the doubt . . . .")

Since the range proffered by Dr. Davis was 4-6 hrs., the ALJ did not err in selecting the upper

threshold of the range.

Plaintiff argues next that Dr. Davis was "not privy to the MRI of [her] lumbar spine, which

revealed multilevel degenerative disc changes with significant spinal stenosis . . . ."  (Doc. 13-1, p.

10)  The ALJ addressed the MRI at length as shown below:

> [O]n April 12, 2010, a lumbar MRI scan was performed.  The results
> showed multilevel degenerative changes and facet arthropathy within
> the lower thoracic and lumbar spine, multiple areas of disc bulging
> and bony changes resulting in areas of central and bilateral foraminal
> stenosis, moderate central and moderately severe bilateral foraminal
> stenosis at L4-5, moderate central canal stenosis at L2-3, and a
> moderate-sized disc protrusion at L1-2 with thecal sac effacement but
> no nerve root impingement . . . .  On May 4, 2010, the claimant
> underwent a neurosurgical consultation.  On examination, she had
> diminished sensation in the dorsum of her right foot and positive
> straight leg raises, but the rest of the examination was negative for
> any abnormalities . . . .  She was diagnosed with lumbar
> radiculopathy, prescribed Lyrica, and referred to physical therapy.
>
> It does not appear that the claimant sought any further treatment for
> her back problems.
>                           . . .
>
> The claimant also sought minimal treatment for her back problems.
> In May 2010, she had an abnormal finding[] of diminished sensation
> in her right foot and positive straight leg raises.  However, just a few
> days later at her first medical consultative examination, she had
> normal sensation, motor strength, and deep tendon reflexes; negative
> straight leg raises; and normal range overall except for decreased
> lumbar range of motion.  She again had a normal physical
> examination at a second consultative examination in October 2010,
> but this time she had normal range of motion throughout.

> After the second medical consultative examination, the claimant only
> sought treatment once more in May 2012 for a respiratory infection.
> Again, she had a normal physical examination, with normal joint
> stability, gait, range of motion, and reflexes.

(Doc. 11, pp. 22, 24-25)  The ALJ noted that plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not credible to the extent they [we]re inconsistent with the above residual functional capacity assessment."  (Doc. 11, p. 24)

"[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007)(quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469. 475 (6th Cir. 2003)).  However, the ALJ's decision to discount a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record . . . ." SSR 96-7p, 1996 WL 374186 (SSA).

When a claimant alleges disabling pain, there is a reasonable expectation that the claimant will seek treatment to alleviate that pain.  *See Strong v. Soc. Sec. Admin.*, 88 Fed.Appx. 841, 846 (6th Cir. 2004); *McKenzie v. Comm'r of Soc. Sec. Admin.*, 215 F.3d 1327 at * 4 (6th Cir. 2000); *McGuire v. Comm'r of Soc. Sec.*, 178 F.3d 1295 * 7 (6th Cir. 1999); *Russell v. Sec'y of Health and Human Serv's*, 921 F.2d 277 * 3 (6th Cir. 1990)(citing *Awad v. Sec'y of Health & Human Serv's*, 734 F.2d 288, 289-90 (6th Cir. 1984); *cf.* SSR 96-7p, 1996 WL 374186 at * 7 (July 2, 1996); *Keeton v. Comm'r of Soc. Sec.*, 583 Fed.Appx. 515, 532 (6th Cir. 2014).  Plaintiff's failure to seek treatment for her back pain reflects adversely on her credibility.  Consequently, the ALJ did not err in determining that her alleged back pain was not disabling.

For all the reasons stated above, plaintiff's first claim of error is without merit.

## 2.  Whether the ALJ's Decision and Findings Are Internally Inconsistent with Respect to Plaintiff's Upper

## Extremity Impairments/Limitations

The crux of plaintiff's second claim of error is that the ALJ erred in not including "any limitations on [plaintiff's] use of her right upper extremity for pushing, pulling, reaching, handling, fingering or feeling." (Doc. 13-1, p. 11) Plaintiff's arguments pertain to plaintiff's alleged neck-related issues and those limitations attributable to carpel tunnel syndrome.

The ALJ's RFC assessment is required to include "medically determinable impairment(s) . . . which . . . may cause limitations and restrictions which affect other work-related abilities." 20 C.F.R. § 404.1545(d). "[T]he ALJ 'is required to incorporate only those limitations [he] accept[s] as credible'" into the RFC. *Myatt v. Comm'r of Soc. Sec.*, 251 Fed.Appx. 332, 336 (6th Cir. 2007)(citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir.1993)).

Plaintiff makes the following arguments in support of her claim that she is limited in her ability to reach overhead because of neck pain: 1) one of the state agency medical consultants determined that she was able to reach overhead only occasionally; 2) the ALJ "stat[ed] only that 'the claimant's treating physician did not mention that as a restriction even while the claimant was healing from her neck surgery[']"; 3) plaintiff's ability to "reach . . . overhead or otherwise . . . was . . . [not] addressed by this physician." (Doc. 13-1)

Based on plaintiff's reference to p. 380 in the record, it appears that the state agency consultant to whom she refers is Dr. Fletcher, a nonexamining, nontreating source. Although the ALJ did not mention Dr. Fletcher by name in his decision, the ALJ referred to his opinion in the statement: "[o]ne of the state agency consultants restricted the [plaintiff] to no more than occasional overhead reaching." (Doc. 11, p. 25) As plaintiff correctly notes, the ALJ discounted Dr. Fletcher's opinion because "the claimant's treating physician did not mention that as a restriction even while the claimant was healing from her neck surgery." (Doc. 11, p. 25) The "treating physician" to whom

the ALJ referred by exhibit number was Dr. Allan.[13]

As a nonexamining, nontreating source, Dr. Fletcher's opinion is entitled to the least weight among the three categories of acceptable medical sources, *i.e.*, nonexamining, nontreating sources such as Drs. Fletcher and Pennington, examining, nontreating sources such as Drs. Davis and Mangus, and treating sources such as Dr. Allen. *See Gayheart*, 710 F.3d at 375 (citing 20 C.F.R §§ 404.1502 and 404.1527(c)(2)). Generally speaking, the opinion of a treating-source must be given "controlling weight." *Gayheart*, 710 F.3d at 376 (quoting 20 C.F.R. § 404.-1527(c)(2)).

As previously noted above at 5, Dr. Fletcher determined that plaintiff had limited ability to reach in all directions, including overhead. (Doc. 11, p. 380) Doctor Fletcher's only explanation for this restriction is in the notation: "FRQ OHR BI." (Doc. 11, p. 380) "FRQ OHR BI" appears to be shorthand for "frequent overhead bilaterally" or, as explained above at p. 12, Dr. Fletcher limited plaintiff's ability to reach overhead to not more than 2/3 of a normal 8 hr. workday.

Although plaintiff does not mention the opinions of Drs. Davis and Mangus, both examining, nontreating sources, their opinions are relevant. As previously noted above at p. 4, Dr. Davis noted that plaintiff's neck was normal and, although slow, her neck flexion, extension, lateral flexion, and rotation were normal. Doctor Davis also noted that plaintiff's shoulders were normal as well. Doctor Davis did not assess plaintiff with any reaching limitations. As previously noted above at p. 5, Dr. Mangus noted that plaintiff's neck was normal, her ability to grasp and manipulate objects was normal, and her whole-body range of motion was normal as well. As examining albeit nontreating sources, the opinions of Drs. Davis and Mangus are entitled to more weight than Dr. Fletcher's.

---

[13]  The record shows that Dr. Allen treated plaintiff more than a dozen times from 2007 to 2010 (Doc. 11, pp.165, 321, 326-42, 352, 355-56, 492-93, 498-99), and that he was the surgeon who performed the cervical laminectomy and foraminotomy in 2008 (Doc. 11, p. 330). Doctor Allen was a treating physician under the rules.

Finally, there is Dr. Allen, with respect to whom plaintiff complains that he did not address plaintiff's ability to reach overhead. As noted above at p. 3, Dr. Allen began treating plaintiff for neck pain as early as July 12, 2007. As explained above at p. 3, Dr. Allen performed neck surgery on plaintiff in January 2008, following which he returned plaintiff to regular duty. Given that Dr. Allen was a treating physician, and given that he returned plaintiff to regular duty after he performed neck surgery, it is reasonable to conclude that Dr. Allen considered neck-related issues before returning plaintiff to regular duty.

As for plaintiff's right carpal tunnel syndrome, Dr. Allen reported that plaintiff appeared to have carpal tunnel syndrome, and plaintiff testified at the hearing that she had been diagnosed with carpal tunnel syndrome, that she had trouble grasping, holding, and handling things, but that she had not sought treatment to correct/relieve the problem. On the other hand, as previously noted above at pp. 4-5, Dr. Davis reported normal wrist, finger motion/dexterity with good grip 5/5, and Dr. Mangus reported that plaintiff's grip strength was 40 lbs. in each hand, her ability to grasp and manipulate objects was normal, her strength was 5/5 in all muscle groups, all range of motion was within normal limits, there was no tenderness, redness, swelling, spasm, joint enlargement or muscle wasting in any joint examined, and there was a negative Tinel's and Phalen's Signs bilaterally.

The record also supports the ALJ's observation that plaintiff "did not seek any treatment for right carpal tunnel syndrome after the alleged onset date," a period of more than 3 1/2 years at the time of the hearing. (Doc. 11, p. 25) As previously explained above at p. 14, failure to seek appropriate medical treatment reflects adversely on plaintiff's credibility as to the symptoms and limitations alleged. The opinions of Drs. Davis and Mangus taken together with plaintiff's failure to seek medical treatment in more than 3 ½ years provide substantial evidence that plaintiff's carpal tunnel syndrome was not so severe as to "cause limitations and restrictions which affect other work-

related abilities" as required under 20 C.F.R. § 404.1545(d).

Plaintiff's second claim of error is without merit for the reasons explained above.

### 3. Whether the ALJ Erred in Not Evaluating Plaintiff's Vision Impairment or Include Any Vision Related Limitations in His RFC Determination

Plaintiff asserts that the ALJ erred in not including her vision impairment in his RFC assessment. (Doc. 13-1, p. 12) Plaintiff argues that her vision impairment is "well-documented," and that "all of the medical opinions of record have assessed [vision] as one of her impairment[s]." (Doc. 13-1, p. 13) As previously noted above at pp. 4-6, Drs. Davis, Fletcher, Mangus, and Pennington all referred to plaintiff's distance visual acuity deficit, with Dr. Mangus also reporting that plaintiff's prescription for her glasses was more than ten years old at the time he tested her.

Although SSR 96–8p requires a "function-by-function evaluation" to determine a claimant's RFC, the ALJ is not required to discuss those capacities for which no limitation is alleged. *See Winslow v. Comm'r of Soc. Sec.*, 566 Fed.Appx. 418, 421 (6th Cir. 2014)( citing *Rudd*, 531 Fed.Appx. at 729; *Delgado v. Comm'r of Soc. Sec.*, 30 Fed.Appx. 542, 547-48 (6th Cir. 2002)(*per curiam*)(collecting cases)).

As previously established above at pp. 1-2, plaintiff's application for benefits was based on neck and back pain, degenerative disc disease, chronic bronchitis and COPD with breathing problems, pain from bone spurs, peripheral vascular disease, right leg claudication, heart disease, and depression. Plaintiff's application for benefits was not based on any visual acuity deficit.

In a Disability Field Report dated December 15, 2009, completed pursuant to a face-to-face interview, the examiner noted that plaintiff reported no difficulty reading or seeing. (Doc. 11, p. 189) In an Adult Function Report dated December 24, 2009, plaintiff did not check the box labeled "Seeing" when asked to identify her limitations. (Doc. 11, p. 212) In an Adult Function report

dated August 17, 2010, plaintiff once again did not check the box labeled "seeing" as a limitation that prevented her from working. (Doc. 11, p. 244) In a Disability Report on appeal dated August 9, 2010, when asked if she had any new physical or mental limitations, plaintiff made no reference to any visual limitations. (Doc. 11, p. 233) In another Disability Report on appeal dated July 4, 2011, plaintiff once again did not report vision as a condition that prevented her from working. (Doc. 11, p. 265) In a third Disability Report on appeal dated August 17, 2011, plaintiff again did not report vision as a condition that prevented her from working. (Doc. 11, p. 273) Finally, in plaintiff's brief before the Appeals Council, plaintiff alleged the following severe impairments: degenerative disc disease; right carpal tunnel syndrome; hypertension; coronary artery disease; obesity; lung disease; major depressive disorder; postraumatic stress disorder. (Doc. 11, p. 9) No mention is made to any visual acuity limitation.[14]

The ALJ complied with the applicable regulations by assessing each of plaintiff's work-related limitations at issue. *Winslow*, 566 Fed.Appx. at 421 (citing *Rudd*, 531 Fed.Appx. at 729). Therefore, the plaintiff's third claim of error is without merit.

### 4. Whether the ALJ Erred in Not Considering or Evaluating Plaintiff's Obesity in Accordance with SSR 02-01p

Plaintiff argues that the ALJ failed to consider her obesity "adequately" given its "exacerbating effects" on her other impairments. (Doc. 13-1, p. 13) More particularly, plaintiff argues that the ALJ "failed to make any analysis or findings regarding [her] obesity . . . ." (Doc. 13-1, pp 13-14)

---

[14] Actually, plaintiff does refer to her vision once. In the representative brief submitted by counsel to the ALJ on September 5, 2012 two weeks before the administrative hearing, counsel referred to Dr. Mangus' consultive examination arguing that the doctor noted plaintiff "has visual acuity deficit but no physical limitations were assessed." (Doc. 11, pp. 282-84) Council then urged "that no weight should be given to [Dr. Mangus'] analysis as he [wa]s not a treating physician and the scope of the exam was limited." (Doc. 11, pp. 283-84)

"Although obesity [i]s no longer a separately listed impairment under step three, the Commissioner [has] explained that obese claimants can still prevail at step three by proving that their obesity combined with other ailments equals the severity of a different listed impairment." *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 644 (6th Cir. 2006)(citation omitted).  However, SSR 02–01p, to which plaintiff makes specific reference, does not require the ALJ to use any "particular mode of analysis," but merely directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation.  *Shilo v. Comm'r of Soc. Sec.*, __ Fed.Appx. __, 2015 WL 349031 at * 3 (citing *Bledsoe v. Barnhart*, 165 Fed.Appx. 408, 411-12 (6th Cir.2006)).

The ALJ determined at step three that plaintiff's obesity was a severe impairment.  (Doc. 11, p. 18)  Citing SSR 02-01p, the ALJ then concluded in his step four analysis that "[t]here is no indication in the record . . . that the claimant's obesity, whether analyzed individually or in combination with another impairment, meets or medically equals the criteria for any listing."  (Doc. 11, p. 18)  The ALJ also opined that "there [wa]s no indication that the claimant's obesity caused symptoms and/or limitations greater than those caused by her other impairments."  (Doc. 11, p. 25)

Of the records before the court, only Dr. Davis refers to plaintiff as obese.  (Doc. 11, p. 370) Apart from Dr. Davis' observation, the record is devoid of any record, report, or other document written by any medical source, acceptable or otherwise, in which any opinion is posited that plaintiff's obesity individually, or in combination with another impairment, meets or equals the criteria for any listing.  In short, there is nothing in the record that even remotely suggests that plaintiff's obesity has a limiting effect in its own right, nor is there anything record that plaintiff's obesity has or likely will have an exacerbating effect on any of plaintiff's other severe impairments.

Plaintiff's fourth claim of error is without merit.

### 5. Whether the Jobs/Job Titles Provided by the ALJ at Step Four Match
### the Jobs Plaintiff Actually Performed Previously, and
### Whether These Jobs Are Relevant
### Under the Regulations

Plaintiff argues that the ALJ erred in relying on the jobs in his determination that she was capable of performing PRW as a production assembler and sorter/packer. (Doc. 13-1, pp. 16-17)

Social Security Ruling 00-4P instructs the ALJ to "identify and obtain a reasonable explanation for any conflicts between occupational evidence provide by VEs or VSs [vocational specialists] and information in the . . . [DOT] . . . ." SSR 00-4P, 2000 WL 189704 at *1 (Dec. 4, 2000). However, the law is well established that the ALJ's duty to this end is satisfied if he asks the VE whether his testimony is consistent with the DOT. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 858 (6th Cir. 2010); *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605-06 (6th Cir. 2009). The ALJ is not required to conduct an independent investigation into the VE's testimony to determine if the VE's testimony is correct. *Kyle*, 609 F.3d at 858; *Lindsley*, 560 F.3d at 606.

The ALJ asked the VE whether his testimony "had been consistent with the *Dictionary of Occupational Titles*." (Doc. 11, p. 63) The VE answered, "Yes, it has, Your Honor." In asking that question, and receiving the VE's answer in the affirmative, the ALJ fulfilled his duty under *Kyle* and *Lindsley*. As there was nothing in the subsequent exchanges between the ALJ and the VE, or apparent anywhere else in the transcript of the hearing, that would have alerted the ALJ to an "actual, obvious, indisputable conflict," the ALJ had no obligation to pursue the matter.

Plaintiff's fifth claim of error is without merit.

### IV. RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 13) be **DENIED** and the Commissioner's decision **AFFIRMED**.

The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 15th day of April, 2015.

/s/ Joe B. Brown
Joe B. Brown
United States Magistrate Judge